## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IESHIA PAUL-EDWARDS, | ) |
| | ) |
| Plaintiff, | )     Case No. _____ |
| | ) |
| v. | ) |
| | )     JURY TRIAL DEMANDED |
| DEREK HEINZ, LATOYA HUGHES, | ) |
| JUSTIN HAMMERS, RYAN | ) |
| NOTTINGHAM, JEANMARIE CASE, | ) |
| MELINDA EDDY, MICHAEL LONG, | ) |
| SARAH TAAPKEN, BENJAMIN ESTES, | ) |
| JANEEN WRIGHT, JICOLE HICKLE, | ) |
| JOSH CHRISTINE, MYRON NEISLER, | ) |
| JAMES HARVEY, MARSHA MIBBS, | ) |
| ARACELI CABARCAS, TIONA | ) |
| FARRINGTON, STEPHANY TREJOS, | ) |
| NATASHA DILLARD, DAVID | ) |
| BRAINARD,  SHELBI RENTMEISTER | ) |
| (AKA SHELBI RUSSELL), HEIDI | ) |
| BROWNE, LATISHA O'NEAL, | ) |
| DANIELLE MITCHELL, MICHAEL | ) |
| LONG, KIT CLAPP,  LUKE FAIRLESS, | ) |
| CHAD MCGINNIS,  TASHA YOUNG, | ) |
| JOHN SOKOL, ELAINE WORTH, CAMMI | ) |
| PIERCE, ABBEY VENTURINI, OFFICER | ) |
| MARRISA HAYES, STEVEN MOORE, | ) |
| JAMES SETTLES, and J. | ) |
| BERGSCHNEIDER | ) |
| | ) |
| Defendants. | |

## **COMPLAINT**

Now comes Plaintiff, Ieshia Paul-Edwards, by and through her attorneys, complaining of

Defendants Derek Heinz, Latoya Hughes, Justin Hammers, Ryan Nottingham, JeanMarie Case,

Melinda Eddy, Michael Long, Sarah Taapken, Benjamin Estes, Janeen Wright, Jicole Hickle,

Josh Christine, Myron Neisler, James Harvey, Marsha Mibbs, Araceli Cabarcas, Tiona

Farrington, Stephany Trejos, Natasha Dillard, David Brainard, Shelbi Rentmeister (aka Shelbi

Russell), Heidi Browne, Latisha O'Neal, Danielle Mitchell, Kit Clapp, Luke Fairless, Chad

McGinnis, Tasha Young, John Sokol, Elaine Worth, Cammi Pierce, Abbey Venturini, Marrisa Hayes, Steven Moore, James Settles, J. Bergschneider as follows:

## INTRODUCTION

1.    While Ms. Paul-Edwards was incarcerated at Logan Correctional Center ("Logan") in Illinois between the fall of 2022 and spring of 2024, correctional officer Derek Heinz began a pattern of grooming her. Among other things, Defendant Heinz used his position of power to prevent Ms. Paul-Edwards from talking to her children's father and he controlled her day-to-day activities. Defendant Heinz regularly told Ms. Paul-Edwards about the sexual activities he wanted to do with her. Ultimately, Defendant Heinz sexually assaulted Ms. Paul-Edwards by touching her groin.

2.    Defendants, including the Director of the Illinois Department of Corrections ("IDOC"), Chief of Operations, Agency PREA Coordinator, Wardens, PREA Compliance Managers, PREA Retaliation Monitor, PREA Incident Review Team, and Internal Affairs Officers, all had actual or constructive knowledge of the conditions at Logan that led to Ms. Paul-Edwards' sexual assault, but failed to implement systems, processes, or controls to prevent or address the sexual abuse Ms. Paul-Edwards suffered while in their care. As a result, Ms. Paul-Edwards seeks redress for her injuries and violations of her rights, including compensatory and punitive damages, attorneys' fees, costs, and other remedies.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 as this case arises under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

4.      Venue is appropriate in the Central District of Illinois pursuant to 28 U.S.C. § 1391(b) as the events complained of occurred exclusively in this district.

## PARTIES

5.      Plaintiff Ieshia Paul-Edwards is a citizen of the United States and at all times relevant to this case, a resident of Illinois. Between the fall of 2022 and the spring of 2024, as well as the spring of 2025, Ms. Paul-Edwards was incarcerated at Logan Correctional Center, a prison operated by IDOC in Lincoln, Illinois. Ms. Paul-Edwards has worked hard to rebuild since she was released from Logan. She has worked at two businesses in her community, and has maintained her sobriety. While in Logan, Ms. Paul-Edwards held a job in the dietary department and participated in multiple programming opportunities which earned time off her sentence, including the Wells substance abuse program; educational programming in math and science; and a multi-week program covering topics such as coping skills, communication, and trauma.

6.      Defendant **Derek Heinz** was, at all times relevant to the complaint, an employee of IDOC and a correctional officer at Logan. Defendant Heinz was acting under color of law during the events at issue in this case.

7.      At all times relevant to this complaint, Defendant **Latoya Hughes** held the position of Director or Acting Director of IDOC with authority over all IDOC facilities, including Logan. Defendant Hughes' responsibilities included promulgating and/or enforcing rules, regulations, policies, and procedures to ensure the safety and security of individuals in IDOC custody, including Ms. Paul-Edwards. Defendant Hughes was responsible for overseeing the conduct and training of staff at IDOC facilities. At all times relevant to this complaint, Defendant Hughes was acting under color of law and within the scope of her employment. Defendant Hughes is sued in her individual capacity.

8.    At all times relevant to this complaint Defendant **Justin Hammers** held the position of IDOC Chief of Operations. In this position, Defendant Hammers possessed authority over security staff at IDOC facilities, including Logan. Defendant Hammers was responsible for ensuring that security staff were properly trained and conducted themselves in accordance with applicable laws, regulations, and standards. At all times relevant to this complaint, Defendant Hammers was acting under color of law and within the scope of his employment. Defendant Hammers is sued in his individual capacity.

9.    At all times relevant to this complaint, Defendant **Ryan Nottingham** held the position of Agency PREA Coordinator. In this position, Defendant Nottingham was responsible for ensuring the reasonable safety of prisoners at all IDOC facilities including Logan, including by developing, implementing, and overseeing policies and training to prevent and remedy sexual abuse and misconduct; maintaining written directions for IDOC staff regarding these policies pursuant to the Prison Rape Elimination Act of 2003 ("PREA"); ensuring PREA audits are regularly conducted; and preparing annual PREA reports evaluating the safety and security of prisoners at IDOC facilities and compliance with PREA and all applicable laws, rules, regulations, policies, and procedures. At all times relevant to this complaint, Defendant Nottingham was acting under color of law and within the scope of his employment. Defendant Nottingham is sued in his individual capacity.

10.    At times relevant to this complaint, Defendants **JeanMarie Case, Melinda Eddy, and Michael Long** held the position of Warden, Acting Warden, Assistant Warden, and/or Day to Day Warden of Logan (hereinafter, the "Warden Defendants"). The Warden Defendants were responsible for the organization and supervision of Logan and for ensuring the reasonable safety of prisoners, including preventing staff-on-prisoner violence, such as sexual assault by officers.

4

The Warden Defendants were also responsible for overseeing day-to-day operations at Logan, including compliance with PREA and preventing sexual abuse and misconduct at the prison; for promulgating and implementing rules, regulations, policies, and procedures to ensure the reasonable safety of women in custody at Logan; for supervising, training, assigning, and disciplining staff at Logan, including Defendant Heinz; and for ensuring the facility develops, documents, and complies with a staffing plan that provides for adequate levels of staffing and video monitoring to protect prisoners from sexual abuse and misconduct. As such, these Defendants were acting under color of law and within the scope of their employment and are sued in their individual capacities.

11.    At times relevant to this complaint, Defendants **Sarah Taapken, Benjamin Estes, and Janeen Wright** held the position of PREA Compliance Manager and/or Backup PREA Compliance Manager for Logan (hereinafter, the "PREA Compliance Manager Defendants"). In these positions, these Defendants were responsible for ensuring the reasonable safety of prisoners at Logan, including preventing sexual abuse and misconduct by officers; developing, planning, and overseeing efforts to address the problem of sexual abuse and misconduct at Logan; and for ensuring compliance with PREA regulations and standards for preventing sexual misconduct at the prison. As such, these Defendants were acting under color of law and within the scope of their employment and are sued in their individual capacities.

12.    At times relevant to this complaint, Defendant **Janeen Wright** held the position of PREA Retaliation Monitor for Logan (hereinafter, the "PREA Retaliation Monitor Defendant"). In this position, this Defendant was responsible for ensuring the reasonable safety of prisoners at Logan, including preventing sexual abuse and misconduct by officers, and monitoring and preventing retaliation against prisoners who have made PREA reports or complaints. As such, this

Defendant was acting under color of law and within the scope of her employment and is sued in her individual capacity.

13.    At times relevant to this complaint, Defendants **Jicole Hickle, Josh Christine, Myron Neisler, James Harvey, Marsha Mibbs, Araceli Cabarcas, Tiona Farrington, Stephany Trejos, Natasha Dillard, David Brainard, Sarah Taapken, Shelbi Rentmeister (aka Shelbi Russell), Heidi Browne, Latisha O'Neal, Danielle Mitchell, Michael Long, Kit Clapp, Melinda Eddy, Luke Fairless, Chad McGinnis, David Brainard, Janeen Wright, Tasha Young, John Sokol, Elaine Worth, Cammi Pierce, Abbey Venturini, and Benjamin Estes** were members of the PREA Incident Review Team at Logan (hereinafter, the "PREA Incident Review Team Defendants"). In this role, these Defendants were responsible for ensuring the reasonable safety of prisoners at Logan, including preventing sexual abuse and misconduct by officers, evaluating and recommending policy changes to prison administrators to address the problem of sexual abuse and misconduct at the facility, and for ensuring compliance with PREA regulations and standards for preventing sexual abuse and misconduct at the prison. As such, these Defendants were acting under color of law and within the scope of their employment and are sued in their individual capacities.

14.    At times relevant to this Complaint, Defendant Internal Affairs Officers **Benjamin Estes, Kit Clapp, Chad McGinnis, Tasha Young, and Elaine Worth** (hereinafter, the "Internal Affairs Officer Defendants") were responsible for investigating PREA reports, issuing findings to address the problem of sexual abuse and misconduct at the facility, and ensuring compliance with PREA regulations and standards for preventing sexual abuse and misconduct at the prison. As such, these Defendants were acting under color of law and within the scope of their employment and are sued in their individual capacities.

6

15.     At times relevant to this Complaint, Defendant Correctional Officers **Marrisa Hayes, Steven Moore, James Settles, and J. Bergschneider** were correctional officers at Logan. At all times relevant to this complaint, these Defendants were acting under color of law and within the scope of their employment and are sued in their individual capacities.

## FACTUAL ALLEGATIONS

**Logan Correctional Center's Culture of Silence and Abuse of Prisoners by Corrections Personnel**

16.     IDOC has "a zero tolerance policy for sexual abuse and sexual harassment" and must "establish and maintain a program for the prevention and intervention of sexual abuse and harassment in correctional facilities in accordance with the standards established by the Prison Rape Elimination Act of 2003." IDOC Administrative Directive 04.01.301.

17.     An incarcerated person cannot consent to sexual contact with a correctional officer, as set forth by the Prison Rape Elimination Act of 2003, Illinois law, and IDOC policy. All sexual relations between correctional officers and prisoners are abusive even if a sexual act would have been considered consensual if it occurred outside of a prison.

18.     The state of Illinois criminalizes sexual relations between staff and prisoners. A correctional officer engaging in sexual penetration with a person in custody is guilty of Criminal Sexual Assault, a Class 1 felony punishable by up to 15 years in prison. 720 ILCS 5/11-1.20(a)(2); *see also* 720 ILCS 5/11-1.50(a)(2) (Criminal Sexual Abuse felony for sexual conduct not involving penetration); 720 Ill. Comp. Stat. 5/11-9.2 (Custodial Sexual Misconduct). In fact, federal law and all fifty states (plus the District of Columbia) have made it a crime for prison officials to engage in sexual activity with prisoners.

19.    Despite IDOC's "zero tolerance" sexual assault policy, sexual abuse and misconduct is widespread at Logan, and a large number of prisoners have reported being assaulted and harassed by prison staff.

20.    The continuing sexual abuse and misconduct by correctional officers at Logan is widely acknowledged but deliberately ignored.

21.    Between 2020 and 2024, IDOC reported that 279 PREA complaints were made by prisoners at Logan. These complaints are a direct consequence of a pattern of the prison failing to protect incarcerated individuals from sexual abuse. The number of allegations of sexual harassment and sexual assault at Logan in recent years, and the number of those allegations perpetrated by staff, are outlined in the below chart[1]:

| Year | Allegations of Sexual Harassment and Abuse at Logan Correctional Center | Number of Allegations of Staff-Perpetrated Abuse |
|------|-----------------------------------------------------------------------|--------------------------------------------------|
| 2020 | 68 | 18 |
| 2021 | 51 | 17 |
| 2022 | 55 | 17 |
| 2023 | 36 | 16 |
| 2024 | 69 | 34 |

22.    In addition to the instances of sexual harassment and sexual assault reported in the PREA complaints, staff-on-prisoner sexual assaults at Logan have been referred to the Illinois State Police ("ISP") for investigation.

23.    According to data provided in response to open records requests, between January 2021 to June 2025, 85 PREA complaints were made by prisoners against Logan staff for sexual

---

[1] The figures in this chart were compiled from the 2020 to 2024 Annual Illinois Department of Correction PREA Reports, available at https://idoc.illinois.gov/programs/prisonrapeeliminationactof2003.html.

abuse, sexual misconduct, and sexual assault. Yet, only six staff members received any disciplinary action, and only three of the six were suspended or discharged. Further, only seven of the total PREA complaints were referred by ISP to the State's Attorney's Office for charges. Staff-on-prisoner sexual assaults at Logan have also generated civil lawsuits. The assaults subject to such civil litigation include, for example: *Farris v. Kohlrus, et al.,* No. 3:17-cv-3279 (C.D. Ill. Nov. 28, 2017), *Doe v. MacLeod et al.*, No. 3:18-cv-3191 (C.D. Ill. Aug. 2, 2018), and *Martinez v. Case, et al.*, No. 24-cv-1279 (C.D. Ill. Aug. 9, 2024).

24.    Since 2023, two federal juries in the Central District of Illinois rendered multi-million-dollar verdicts in favor of plaintiffs after concluding that Logan officials failed to protect female prisoners from the risk of sexual abuse. *See MacLeod*, No. 3:18-cv-3191, Dkt 223; *Metcalf v. Burke*, No. 18-cv-3260, Dkt. 189 (C.D. Ill. Feb. 2, 2024).

25.    Though Logan has cameras installed to monitor staff and prisoners, those cameras do not capture all areas of the prison.

26.    On information and belief, there are many black-out areas where individuals cannot be seen by the cameras, and these black-out areas are widely known to staff. For example, Correctional Officers are known to take prisoners into the property room near the staff gym, which has a bed in it, in order to have sex because the area is not monitored by cameras.

27.    In reference to the bed in the property room, one Correctional Officer asked Ms. Paul-Edwards, "Do you know how many girls have been fucked on that bed?"

28.    Another Correctional Officer once saw Ms. Paul-Edwards looking into the room and told her, "You're going to ruin it for everyone else," implying that she should not acknowledge or report what she knew about the room.

29.     It was common for correctional officers or staff to "claim" prisoners that they wanted to have sexual relations with in conversations amongst themselves, within earshot of prisoners, or by statements directly to prisoners.

30.     Correctional officers and other staff commit sexual abuse against incarcerated women in a variety of ways, including but not limited to, sexual contact through physical force, coercing sexual contact through other means, and/or inducing sexual contact through promising or providing privileges and other goods. Correctional officers also force sexual contact with incarcerated women in the guise of romantic relationships and other grooming, and while this contact is prohibited by law and policy, it is not actively dissuaded at Logan.[2]

31.     Logan allows this abuse to perpetuate by creating an environment where this abuse is normalized, protecting offenders from investigation and discipline, and retaliating against victims who come forward.[3] It is further perpetuated by correctional officers who fail to report their co-workers' abuse and coercion.

32.     Given the documented history of sexual misconduct and abuse of prisoners by correctional officers and other staff, Defendants Hughes, Hammer, and Nottingham, and the Warden Defendants, PREA Compliance Manager Defendants, Backup PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, and Internal Affairs Defendants knew or should have known about an ongoing problem of sexual misconduct and abuse by officers at Logan.

33.     At all times relevant to the complaint, Defendants Hughes, Hammer, and Nottingham, and the Warden Defendants, PREA Compliance Manager Defendants, Backup PREA

---

[2] Michelle VanNatta, *Conceptualizing and Stopping State Sexual Violence Against Incarcerated Women*, 37 Soc. Just. 27, 32 (2010)
[3] Claudia Lomeli-Rodriguez, *Abuse of Power: Sexual Abuse in the Federal Prison System*, 1 Annual Review of Criminal Justice Studies 132, 140–42 (2023).

Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, and Internal Affairs Defendants could have taken steps to address the culture of sexual misconduct and abuse by employees at Logan. But Defendants instead failed to make changes to the policies, procedures, or practices for detecting and addressing sexual misconduct and abuse by correctional officers and staff.

**Defendant Heinz's Grooming and Abuse of Plaintiff**

34.    Ms. Paul-Edwards was incarcerated at Logan Correctional Facility beginning in the fall of 2022.

35.    At the time, she was recently sober, her children had been removed from her custody, and she had never been to prison before, leaving her in a particularly vulnerable position.

36.    Ms. Paul-Edwards requested a pass from Defendant Heinz while he was working at the desk on House 7.

37.    In the months that followed, Ms. Paul-Edwards continued to have interactions with Defendant Heinz, and he would sometimes give her favors like extra phone time.

38.    At this time, Logan was regularly on lockdown due to Covid-19, so Ms. Paul Edwards' interactions with Defendant Heinz were sporadic.

39.    During one lockdown within a few months of Ms. Paul-Edwards' arrival at Logan, Defendant Heinz approached her while she was on a healthcare pass. During that encounter, Defendant Heinz, unprompted, told Ms. Paul-Edwards that he wanted to be with her. He told her she was "different from other girls" and that he didn't care if he lost his job if it allowed him to be with her. He told her, "I want you."

40.    Defendant Heinz did not quit his job, but he continued to inappropriately interact with Plaintiff, particularly when he was on tower duty.

11

41.    Ms. Paul-Edwards later learned that Defendant Heinz had been placed on tower duty because he had engaged in sexual misconduct with another individual in custody. Ms. Paul-Edwards overheard Defendant Heinz discussing this inappropriate conduct, and when she confronted him, he admitted that he had sex with a woman who he had met while she was incarcerated at Logan, and he paid her so that she would not file a lawsuit.

42.    Upon information and belief, despite knowledge that Defendant Heinz had previously engaged in inappropriate sexual conduct with other women in custody, he was nevertheless placed back on regular correctional duty, where he interacted directly with prisoners, immediately after his assignment to the tower ended.

43.    Defendant Heinz offered Ms. Paul-Edwards contraband materials, including pens and cigarettes, on multiple occasions. Giving out contraband pens is known to be a form of grooming and a way to apply coercive pressure to prisoners by correctional officers at Logan.

44.    Defendant Heinz would allow Ms. Paul-Edwards outside of her room when all prisoners were supposed to be in their rooms. Because Logan was often short-staffed, and there was not always another correctional officer stationed with Defendant Heinz, this meant that Defendant Heinz and Ms. Paul-Edwards would often be alone in the dayroom together.

45.    Defendant Heinz talked to Ms. Paul-Edwards about plans for a shared future and what their lives would be like once Ms. Paul-Edwards was released from IDOC custody. Defendant Heinz told Ms. Paul-Edwards that they would live together when she was released.

46.    Defendant Heinz also told Ms. Paul-Edwards about his economic and social power. He told her that his father was a Sheriff, and a well-known white man who carried a lot of influence in their community. He told her this his family had a lot of money and that they used their money to "make things disappear."

47.　　Defendant Heinz also told Ms. Paul-Edwards about his sexual history and preferences, and he detailed sexual activities that he planned to do with her.

48.　　Defendant Heinz told Ms. Paul-Edwards that he wanted to have sex with her in the prison.

49.　　Defendant Heinz also told Ms. Paul-Edwards that he wanted to see her naked where there were no cameras.

50.　　Ms. Paul-Edwards was apprehensive, but Defendant Heinz insisted that he wanted to see "what [he] would come home to." While Ms. Paul-Edwards was in House 11, Defendant Heinz pressured Ms. Paul-Edwards to take off her clothes while he completed a wing check, where he would walk past each of the cells in her wing.

51.　　Shortly thereafter, while Defendant Heinz was inspecting her cell and her cell-mates were not present, he told Ms. Paul-Edwards to expose herself to him. Ms. Paul-Edwards told Defendant Heinz that she did not want to get in trouble, but he continued to pressure her to expose herself. Ms. Paul-Edwards ultimately opened her towel so that her breasts were exposed to Defendant Heinz. However, when she walked up to Defendant Heinz after his wing check, he was angry. He told her that if she loved him, she would "do more." He said that he wanted to see her "bent over."

52.　　The following day, Defendant Heinz approached Ms. Paul-Edwards and told her that he bought a "pocket pussy" because he was thinking about her the previous night. He told her that he wanted to see her naked again. Ms. Paul-Edwards understood Defendant Heinz to be referring to a handheld masturbation tool that is designed to simulate a vagina.

13

53.     That day, during Defendant Heinz's wing check, Defendant Heinz came to Ms. Paul-Edwards' cell and again told her to expose herself to him, and his continuing pressure led her to remove her towel and bend over, exposing her naked vagina and buttocks to him.

54.     Defendant Heinz deliberately positioned himself in or near the doorway to her cell, telling her that he could not go all the way in because he did not want it to look suspicious on the cameras. He then glided his hand along Ms. Paul-Edwards' leg and his thumb next to her vagina. Defendant Heinz did not seek or receive permission to touch Plaintiff, nor did he tell her in advance that he would touch her during this wing check. Ms. Paul-Edwards did not reciprocate Defendant Heinz's physical contact, but she felt powerless to stop it.

55.     Defendant Heinz only left Plaintiff's cell when he received a call.

56.     Later that day, Defendant Heinz complained to Ms. Paul-Edwards that he would never get to see what he wants. He expressed that he was angry their interaction had been limited.

57.     The following day, Defendant Heinz and Ms. Paul-Edwards were speaking at the desk, which is where Defendant Heinz sat while he was stationed on House 11.

58.     Defendant Heinz asked Ms. Paul-Edwards if she would call the police if he hit her. He told her that he had a temper and had a tendency to hit "where it doesn't show".

59.     Defendant Heinz pulled out a desk drawer, quickly and forcefully, so that it hit Ms. Paul-Edwards on her leg and caused her pain. When she threatened to report him, he told her that he knew she wouldn't because she loved him too much.

60.     Defendant Heinz's abuse was not only physical; he controlled all aspects of Plaintiff's life at Logan.

61.     Defendant Heinz frequently accused Ms. Paul-Edwards of "cheating" on him, and questioned whether she was interested in other correctional officers when she spoke to them.

62.     Defendant Heinz took steps to isolate Ms. Paul-Edwards and control her relationships. Defendant Heinz controlled Plaintiff's phone access, and would restrict her from speaking to her children's father because, he said, "I want you talking to me." He threatened to write her tickets if she spoke to her children's father. He interfered with her relationships with peers and told her she could not participate in typical activities like watching movies with other prisoners. Ms. Paul-Edwards also understood he had told other prisoners to watch her and report information to him.

63.     Defendant Heinz also dictated Ms. Paul-Edwards' movement, and would tell her where he wanted her to be at various times so that he could spend time with her or be able to observe her.

### Retaliation

64.     At one point after Defendant Heinz's sexual assault, Ms. Paul-Edwards overheard Defendant Heinz talking to another prisoner. During the conversation, Defendant Heinz admitted to bringing drugs into the prison.

65.     Ms. Paul-Edwards confronted Defendant Heinz and told him that she was upset that he had lied to her and was bringing drugs into prison.

66.     Defendant Heinz then began to engage in retaliatory behaviors against Plaintiff.

67.     Ms. Paul-Edwards is asthmatic, and on two separate occasions, Defendant Heinz withheld her inhaler when she requested it during asthma attacks. Ms. Paul-Edwards was not given her necessary medication until another Correctional Officer entered the area.

68.     Defendant Heinz also wrote two false incident reports, and one false disciplinary ticket, against Ms. Paul-Edwards after she confronted him about bringing drugs into the prison.

## Failure to Protect

69.     Many officers and prisoners observed Defendant Heinz and Plaintiff's interactions when Defendant Heinz was assigned to work at the tower.

70.     In particular, Defendants Moore, Settles, and Bergschneider all advised Ms. Paul-Edwards to "stay away" from Defendant Heinz, but took no steps to report the inappropriate interactions they observed.

71.     At one point while Defendant Heinz was on tower duty, Ms. Paul-Edwards approached Defendant Hayes. Ms. Paul-Edwards felt she could trust Defendant Hayes because she was a female officer who was crisis trained. Defendant Hayes told Ms. Paul-Edwards that the "tower situation was getting out of hand" and that she should break off her relationship with Defendant Heinz before one of them gets hurt. Defendant Hayes also warned Ms. Paul-Edwards to not tell her things that she "would have to report." She did not report Defendant Heinz.

72.     Officer Lowder was also aware of Defendant Heinz's inappropriate interactions with Ms. Paul-Edwards and passed notes from Ms. Paul-Edwards to Defendant Heinz when Defendant Heinz was working in different areas of Logan.

73.     Officer Chambers told Ms. Paul-Edwards that he saw her and Defendant Heinz talking for long periods of time.

74.     Defendant Heinz was also not the only officer who propositioned Ms. Paul-Edwards for sex.

75.     Officer Rodney Pennington attempted to have a sexual relationship with Plaintiff. He implied that if she had sex with him, she would receive special treatment because of his position in Internal Affairs. On another occasion, Officer Zachary White told Ms. Paul-Edwards that four correctional officers were discussing that they "wanted to fuck her." Officer White said that he "claimed her" so that they would "find someone else to fuck."

16

76.     Ms. Paul-Edwards was told by another Correctional Officer that she was "state property" and that if she didn't like the way she was treated, she shouldn't have come to prison.

**Lasting Trauma of Abuse**

77.     Ms. Paul-Edwards has suffered emotional hardship due to the abuse she experienced at Logan.

78.     Ms. Paul-Edwards has nightmares of Defendant Heinz finding her and beating her.

79.     Ms. Paul-Edwards fears for her safety.

80.     The trauma inflicted upon Ms. Paul-Edwards by Defendants continues to impact her relationships, her day-to-day decisions, and even where she lives.

81.     Ms. Paul-Edwards has had to move since leaving prison because of threats by Defendant Heinz.

82.     As a direct and proximate result of the abuse she suffered, Ms. Paul-Edwards had her right to bodily integrity taken from her.

83.     As a direct and proximate result of the abuse she suffered, Ms. Paul-Edwards had her dignity as a human being taken away from her.

<u>**COUNT I**</u>
**42 U.S.C. § 1983 – CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT AGAINST DEFENDANT DEREK HEINZ**

84.     Ms. Paul-Edwards hereby realleges and incorporates each and every allegation contained in the previous paragraphs as though fully set forth herein.

85.     Defendant Heinz coerced Ms. Paul-Edwards into engaging in sexual activity when she was legally incapable of consenting to that activity.

86.     Defendant Heinz's actions, which included touching Ms. Paul-Edwards' groin, were objectively unreasonable, meant to degrade and humiliate Ms. Paul-Edwards, and served no penological justification.

87.     Defendant Heinz took advantage of his position of power and the inherent vulnerability of confinement settings.

88.     Incarcerated individuals depend on correctional officers for nearly everything in their lives, including safety, access to medical care, and contact with family members. The same was true for Ms. Paul-Edwards and Defendant Heinz.

89.     Sexual assault by a guard is cruel and unusual punishment because it poses a serious risk to a prisoner's health and safety. Defendant Heinz acted with deliberate indifference to an excessive risk to Plaintiff's health and safety.

90.     As a direct and proximate cause of Defendant Heinz's wrongful conduct, Ms. Paul-Edwards' rights were violated and she has experienced injuries, including physical and psychological injuries and lasting severe emotional distress.

**COUNT II**
**42 U.S.C. § 1983 – FAILURE TO PROTECT MS. PAUL-EDWARDS IN VIOLATION OF THE EIGHTH AMENDMENT AGAINST DEFENDANT HUGHES, DEFENDANT HAMMER, DEFENDANT NOTTINGHAM, WARDEN DEFENDANTS, PREA COMPLIANCE MANAGER DEFENDANTS, PREA RETALIATION MONITOR DEFENDANT, PREA INCIDENT REVIEW TEAM DEFENDANTS, AND INTERNAL AFFAIRS OFFICER DEFENDANTS**

91.     Ms. Paul-Edwards realleges and incorporates each and every allegation contained in the previous paragraphs as though fully set forth herein.

92.     In the manner described more fully above, Defendant Heinz's conduct toward Ms. Paul-Edwards violated her right to be free from cruel and unusual punishment. Sexual abuse serves no penological justification.

93.     Defendant Heinz's abuse of Ms. Paul-Edwards was not an isolated incident at Logan, and Defendants Hughes, Hammer, and Nottingham, and the Warden Defendants, PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, and Internal Affairs Officer Defendants were each on notice of numerous

instances of sexual misconduct and abuse by prison staff directed at Logan prisoners, were aware that a systemic sexual assault problem existed at Logan, and were further aware of the custom, policies, and practices at Logan that permitted sexual misconduct and abuse to flourish.

94.    Defendants Hughes, Hammer, and Nottingham, and the Warden Defendants, PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, and Internal Affairs Officer Defendants had actual knowledge of this pattern of sexual abuse, had the realistic opportunity to intervene to prevent or stop the misconduct from occurring, and failed to take reasonable measures to remedy the violations.

95.    Defendants Hughes, Hammer, and Nottingham, and the Warden Defendants, PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, and Internal Affairs Officer were also on notice of Defendant Heinz's sexual misconduct. On information and belief, Defendant Heinz was assigned to the tower because of his inappropriate conduct with another incarcerated woman.

96.    In the alternative, these Defendants were on notice of a substantial risk of harm to Ms. Paul-Edwards and they consciously disregarded that risk.

97.    Specifically, Defendants Hughes, Hammers, and Nottingham were responsible for developing, implementing, and overseeing regulations, policies, procedures, practices, and training to prevent and remedy sexual abuse and misconduct at all IDOC facilities, including Logan. These Defendants were also responsible for ensuring compliance with PREA standards, training staff, and auditing IDOC facilities. Despite numerous lawsuits and complaints over the years highlighting ongoing problems at Logan, Defendants Hughes, Hammer, and Nottingham allowed a culture to persist at Logan that failed to protect individuals in custody from sexual abuse and misconduct. These Defendants knew or should have known of a widespread practice by IDOC

employees at Logan who engaged in sexual abuse or misconduct, including by way of direct reporting and internal investigations, annual PREA compliance reports, PREA audits, John Howard Association Investigations and Reports, grievances, training, reports from counselors and medical staff, meetings, and lawsuits.

98.     The Warden Defendants were responsible for the creation, implementation, oversight, and supervision of all training, policies, and procedures followed by prison staff at Logan. These Defendants were responsible for ensuring the reasonable safety of prisoners at Logan and for ensuring the facility complied with adequate levels of staffing and surveillance to protect prisoners from sexual abuse and misconduct. These Defendants knew or should have known of a widespread practice by prison staff at Logan who engaged in sexual harassment, sexual abuse, or sexual misconduct, including by way of direct reporting and internal investigations, annual PREA compliance reports, PREA audits, John Howard Association Investigations and Reports, grievances, training, reports from counselors and medical staff, meetings, and lawsuits.

99.     The PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants were responsible for the creation, implementation, oversight, and supervision of the training, policies, and procedures at Logan that related to PREA violations. These Defendants knew or should have known of a widespread practice by IDOC employees at Logan who engaged in sexual harassment, sexual abuse, or sexual misconduct, including by way of direct reporting and internal investigations, annual PREA compliance reports, PREA audits, John Howard Association Investigations and Reports, grievances, training, reports from counselors and medical staff, meetings, and lawsuits.

100.     The Internal Affairs Officer Defendants were responsible for or involved in the creation, implementation, oversight, and supervision of the training, policies, and procedures at

Logan that related to PREA violations. These Defendants knew or should have known of a widespread practice by IDOC employees at Logan who engaged in sexual harassment, sexual abuse, or sexual misconduct, including by way of direct reporting and internal investigations, annual PREA compliance reports, PREA audits, John Howard Association Investigations and Reports, grievances, training, reports from counselors and medical staff, meetings, and lawsuits.

101.    The above-described pattern and practice of sexual misconduct by IDOC employees at Logan was so pervasive as to constitute a de facto policy where Defendants Hughes, Hammer, and Nottingham, and the Warden Defendants, PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, and Internal Affairs Officer Defendants had authority over this practice and the duty and power to take steps to make changes to reduce the danger that Ms. Paul-Edwards  and other Logan prisoners would be subjected to sexual misconduct and abuse by prison staff. Each of these Defendants exhibited deliberate indifference to the risk of objectively serious harm of sexual abuse of Logan prisoners by prison staff. These Defendants manifested deliberate indifference to these constitutional violations by failing to take reasonable measures to remedy these violations.

102.    Among other things, Defendants Hughes, Hammers, and Nottingham, and the Warden Defendants, PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, and Internal Affairs Officer Defendants failed to take reasonable steps to either prevent the abuse from occurring or report the misconduct to alleviate the potential for future abuses, thus directly encouraging abuse such as was suffered by Ms. Paul-Edwards. Defendants also failed to adequately investigate, train, supervise, control, and discipline, including terminate, prison staff who engaged in, or were accused of engaging in, sexual abuse and misconduct, thus directly encouraging and facilitating future abuses such as those

affecting Ms. Paul-Edwards. In this way, Defendants directed, knew about, facilitated, approved, condoned, and consented to the conduct that caused the violation of Ms. Paul-Edwards' constitutional rights, and violated Ms. Paul-Edwards' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

103.    As a direct and proximate cause of Defendants Hughes, Hammer, and Nottingham, and the Warden Defendants, PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, Internal Affairs Officer Defendants, actions or failure to act, Ms. Paul-Edwards was sexually abused by Defendant Heinz, her rights were violated, and she has experienced injuries, including physical and psychological injuries and severe emotional distress.

## COUNT III
### 42 U.S.C. § 1983 – FAILURE TO TRAIN IN VIOLATION OF THE EIGHTH AMENDMENT AGAINST DEFENDANT HUGHES, DEFENDANT HAMMER, DEFENDANT NOTTINGHAM, WARDEN DEFENDANTS, PREA COMPLIANCE MANAGER DEFENDANTS, PREA RETALIATION MONITOR DEFENDANT, PREA INCIDENT REVIEW TEAM DEFENDANTS, AND INTERNAL AFFAIRS OFFICER DEFENDANTS

104.    Ms. Paul-Edwards realleges and incorporates each and every allegation contained in the previous paragraphs as though fully set forth herein

105.    The training program at Logan was not adequate to train and supervise the prison's employees on the unique challenges and requirements presented in dealing with women prisoners and to identify and respond to the risks of sexual misconduct and abuse by prison staff.

106.    As set forth more fully above, Defendants Hughes, Hammer, and Nottingham, and the Warden Defendants, PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, and Internal Affairs Officer Defendants were on notice of numerous instances of sexual misconduct and abuse by prison staff directed at Logan prisoners, were aware that a systemic sexual assault problem existed at Logan, and were

22

further aware of the custom, policies, and practices at Logan that permitted sexual misconduct and abuse to flourish. These Defendants were responsible for training IDOC staff to prevent and respond to sexual misconduct and abuse.

107.    As a direct and proximate cause of Defendants Hughes, Hammer, and Nottingham, and the Warden Defendants, PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, and Internal Affairs Officer Defendants' failure to adequately train and supervise Logan staff, Ms. Paul-Edwards was sexually abused by Defendant Heinz, her rights were violated, and she has experienced injuries, including physical and psychological injuries and severe emotional distress.

## COUNT IV
### 42 U.S.C. § 1983 – FAILURE TO PROTECT MS. PAUL-EDWARDS IN VIOLATION OF THE EIGHTH AMENDMENT AGAINST DEFENDANT HAYES, DEFENDANT MOORE, DEFENDANT SETTLES, AND DEFENDANT BERGSCHNEIDER

108.    Ms. Paul-Edwards realleges and incorporates each and every allegation contained in the previous paragraphs as though fully set forth herein.

109.    In the manner described more fully above, Defendant Heinz's conduct toward Ms. Paul-Edwards violated her right to be free from cruel and unusual punishment. Sexual abuse serves no penological justification.

110.    Defendant Heinz's abuse of Ms. Paul-Edwards was not an isolated incident. Defendants Hayes, Moore, Settles, and Bergschneider were each on notice of numerous instances where Defendant Heinz behaved inappropriately towards Ms. Paul-Edwards.

111.    They were on notice that this behavior posed a substantial risk of harm to Ms. Paul-Edwards, and they consciously disregarded that risk.

112.    As a direct and proximate cause of Defendant Hayes, Moore, Settles, and Bergschneider's  failure to act, Ms. Paul-Edwards was sexually abused by Defendant Heinz, her

rights were violated, and she has experienced injuries, including physical and psychological injuries and severe emotional distress.

## COUNT V
### 740 ILCS 82/5 *et seq*. ILLINOIS GENDER VIOLENCE ACT CLAIM AGAINST DEFENDANT DEREK HEINZ

113.    Ms. Paul-Edwards realleges and incorporates each and every allegation contained in the previous paragraphs as though fully set forth herein.

114.    Defendant Derek Heinz subjected Ms. Paul-Edwards to a physical intrusion or physical invasion of a sexual nature by touching her vagina and subjected Ms. Paul-Edwards to act of violence or physical aggression satisfying the elements of battery based in part on her sex by slamming a door into her leg.

115.    Defendant Derek Heinz did this under coercive conditions because this physical intrusion or invasion took place while he was a correctional officer and Ms. Paul-Edwards was incarcerated at Logan Correctional Center.

116.    As a result of Defendant Heinz's wrongful conduct, Ms. Paul-Edwards ' rights were violated and she experienced injuries, including physical and psychological injuries and severe emotional distress.

## COUNT VI
### WILLFUL AND WANTON CONDUCT AGAINST DEFENDANT HEINZ, DEFENDANT HUGHES, DEFENDANT HAMMERS, DEFENDANT NOTTINGHAM, WARDEN DEFENDANTS, PREA COMPLIANCE MANAGER DEFENDANTS, PREA RETALIATION MONITOR DEFENDANT, PREA INCIDENT REVIEW TEAM DEFENDANTS, INTERNAL AFFAIRS OFFICER DEFENDANTS

117.    Ms. Paul-Edwards realleges and incorporates each and every allegation contained in the previous paragraphs as though fully set forth herein.

118.    Defendants' actions were willful and wanton and demonstrated an utter indifference to the safety of Ms. Paul-Edwards and other prisoners. Defendants were aware of or

deliberately indifferent to the fact that their conduct posed a risk to Plaintiff's safety and recklessly disregarded that risk.

119.    As a direct and proximate result of Defendant Heinz, Defendant Hughes, Defendant Hammers, Defendant Nottingham, the Warden Defendants, PREA Compliance Manager Defendants, PREA Retaliation Monitor Defendant, PREA Incident Review Team Defendants, Internal Affairs Officer Defendants willful and wanton misconduct, Ms. Paul-Edwards suffered injuries, including physical and psychological injuries and severe emotional distress.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT DEREK HEINZ

120.    Ms. Paul-Edwards realleges and incorporates each and every allegation contained in the previous paragraphs as though fully set forth herein.

121.    Defendant Heinz engaged in extreme and outrageous conduct by sexually abusing Plaintiff.

122.    Defendant Heinz intended to inflict severe emotional distress or knew that there was a high probability that his conduct would cause severe emotional distress.

123.    Defendant Heinz's extreme and outrageous conduct caused Ms. Paul-Edwards severe emotional distress. Due to the distress caused by Defendant Heinz's actions, Plaintiff's mental health suffered and continues to suffer.

## COUNT VIII
## BATTERY AGAINST DEFENDANT DEREK HEINZ

124.    Ms. Paul-Edwards realleges and incorporates each and every allegation contained in the previous paragraphs as though fully set forth herein.

125.    Defendant Heinz intentionally inflicted bodily harm and engaged in offensive bodily contact when he touched her groin, and when he hit her leg with a drawer after engaging in sexual activity.

126.    Defendant Heinz's actions directly and proximately caused physical and psychological injuries and severe mental distress.

*       *       *

WHEREFORE, Ms. Paul-Edwards hereby prays that this Court enter judgment in her favor and against the defendants, awarding compensatory damages, costs and attorneys' fees, and punitive damages against each defendant in their individual capacities. Ms. Paul-Edwards also requests whatever additional relief this Court deems equitable and just.

### JURY DEMAND

WHEREFORE, Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

Dated: September 12, 2025                Respectfully submitted,

                                         */s/ Elizabeth Austin*
                                         Elizabeth Austin
                                         Leslie Kuhn-Thayer
                                         Lauren Stapleton
                                         SIDLEY AUSTIN LLP
                                         One South Dearborn Street
                                         Chicago, IL 60603
                                         Phone: (312) 853-7000
                                         Fax:    (312) 853-7036
                                         laustin@sidley.com
                                         lkuhntha@sidley.com
                                         lstapleton@sidley.com

                                         Elizabeth Payne
                                         CHICAGO ALLIANCE AGAINST
                                         SEXUAL EXPLOITATION

307 N. Michigan, Suite 1020
Chicago, IL 60601
Telephone:  (773) 244-2230
epayne@caase.org

Nicole Schult
Shireen Jalali-Yazdi
UPTOWN PEOPLE'S LAW CENTER
4413 N. Sheridan
Chicago, IL 60640
Telephone: (773) 769-1411
nicole@uplcchicago.org
shireen@uplcchicago.org
*Counsel for Plaintiff*